# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
### SOUTHERN DIVISION

LESLIE MARIE DETHEROW,     )
        )
       Plaintiff,    )
        )
       v.     )    Case No. 6:24-cv-03295-RK
        )
COMMISSIONER, SOCIAL SECURITY    )
ADMINISTRATION,    )
        )
       Defendant.    )

## ORDER

Before the Court is Plaintiff Leslie Marie Detherow's appeal brought under 42 U.S.C. § 405(g), seeking review of the Commissioner of the Social Security Administration's denial of disability benefits as rendered in a decision by an Administrative Law Judge ("ALJ"). After careful consideration and review, and for the reasons explained below, the Court **ORDERS** that the ALJ's decision is **AFFIRMED**.

## Background

Plaintiff filed protective applications under Title II of the Social Security Act for disability and disability insurance benefits and Title XVI of the Social Security Act for supplemental security income, alleging disability beginning January 1, 2012. (*See* Tr. at 211.) After Plaintiff's applications were denied at both the initial and reconsideration levels, Plaintiff requested a hearing before an ALJ. Following a hearing, (Tr. at 78-115), the ALJ issued an unfavorable decision denying Plaintiff's applications for social security benefits, (Tr. at 211-36). The Appeals Council remanded the portion of the decision related to Plaintiff's protective application for supplemental security income, in part, because the ALJ's decision "does not contain an adequate evaluation of the claimant's headaches." (Tr. at 239.) The Appeals Council directed the ALJ on remand to "consider whether the claimant's headaches medi[c]ally equal the severity of section 11.02 of 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926; Social Security Rulings 19-4p and 17-2p." (Tr. 240.)

Accordingly, a second hearing before an ALJ was held, (Tr. at 40-77), again followed by an unfavorable decision denying Plaintiff's application for supplemental security income under

the Social Security Act, (Tr. at 14-39).[1]  The Appeals Council denied Plaintiff's subsequent request for review of the second unfavorable decision, (Tr. at 1-6), making the ALJ's decision the final decision of the Commissioner.  Plaintiff accordingly seeks judicial review of the ALJ's second unfavorable decision denying her application for supplemental security income under the Social Security Act.

**Standard of Review**

The Court's review of the ALJ's decision denying Plaintiff's applications for benefits under the Social Security Act is limited to whether the decision "complies with the relevant legal requirements and is supported by substantial evidence in the record as a whole." *Halverson v. Astrue*, 600 F.3d 922, 929 (8th Cir. 2010) (quoting *Ford v. Astrue*, 518 F.3d 979, 981 (8th Cir. 2008)).  Put another way, "we will affirm if the ALJ made no legal error and the ALJ's decision is supported by substantial evidence on the record as a whole." *Cropper v. Dudek*, 136 F.4th 809, 813 (8th Cir. 2025) (internal quotation marks omitted).

An ALJ's "failure to comply with [Social Security Act] regulations . . . is legal error." *Lucus v. Saul*, 960 F.3d 1066, 1069 (8th Cir. 2020).  "Substantial evidence is less than a preponderance of the evidence, but is 'such relevant evidence as a reasonable mind would find adequate to support the [ALJ's] conclusion.'" *Grable v. Colvin*, 770 F.3d 1196, 1201 (8th Cir. 2014) (quoting *Davis v. Apfel*, 239 F.3d 962, 966 (8th Cir. 2001)).  To determine whether existing evidence is substantial, the Court takes into account "evidence that detracts from the [ALJ's] decision as well as evidence that supports it." *Cline v. Colvin*, 771 F.3d 1098, 1102 (8th Cir. 2014) (internal quotation marks omitted).  "If the ALJ's decision is supported by substantial evidence, [the Court] may not reverse even if substantial evidence would support the opposite outcome or [the Court] would have decided differently." *Smith v. Colvin*, 756 F.3d 621, 625 (8th Cir. 2014) (citing *Davis*, 239 F.3d at 966).  On judicial review of the ALJ's decision, the Court does not "re-weigh the evidence presented to the ALJ," *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005) (citing *Baldwin v. Barnhart*, 349 F.3d 549, 555 (8th Cir. 2003)), and must "defer heavily to the findings and conclusions of the [ALJ]," *Hurd v. Astrue*, 621 F.3d 734, 738 (8th Cir. 2010).

---

[1] On remand to the ALJ from the Appeals Council, Plaintiff amended her onset date to February 1, 2021, and as a result voluntarily withdrew her request for a hearing as to her application for disability and disability insurance benefits (for which she did not meet the disability insured status requirement under the amended onset date).  (*See* Tr. at 14.)

**Discussion**

## I. The Five Step Sequential Analysis for Social Security Act Benefits

To determine whether a claimant is entitled to benefits under the Social Security Act, the ALJ utilizes a familiar five-step sequential analysis found at 20 C.F.R. §§ 404.1520(a)(4) & 416.920(a)(4), as follows: At Step One the ALJ considers whether the claimant is engaged in substantial gainful work activity. If not, the ALJ moves to Steps Two and Three to consider whether the claimant has any severe medically determinable physical or mental impairment, or a combination thereof (Step Two), and whether any such impairments meet or are medically equivalent to a listed impairment (Step Three). If the ALJ finds that a claimant's impairments (individually or in combination) meet or medically equal a listed impairment, the claimant is entitled to benefits under the Social Security Act. Otherwise, the ALJ continues to Steps Four and Five of the sequential analysis.

At Step Four of the analysis the ALJ determines the claimant's residual functional capacity ("RFC")[2] and considers whether the claimant can still do any past relevant work considering the claimant's RFC as assessed by the ALJ. If the ALJ finds that the claimant can do so, the claimant is not entitled to benefits under the Social Security Act. Alternatively, if the claimant is unable to perform past relevant work given their assessed RFC, the ALJ moves to Step Five. At Step Five, the ALJ considers whether the claimant can do other work that exists in significant numbers in the national economy in light of the claimant's RFC and other characteristics including age, education, and work experience. Only if the ALJ finds that they cannot do so will the claimant be entitled to benefits under the Social Security Act.

## II. The ALJ's Findings

As relevant here, the ALJ found, *inter alia*, that Plaintiff has a severe impairment of migraines (Step Two) but that her migraine do not meet or medically equal a listed impairment (Step Three). At Step Three, the ALJ noted that she considered Listing 11.02 (Epilepsy), consistent with Social Security Ruling 19-4p. (Tr. at 18.) The ALJ found that "the evidence does not demonstrate the criteria required under the listings," (*id.*), as follows:

> The claimant would not meet or equal the requirements of [Social Security Ruling]
> 19-4p (Evaluating Cases Involving Primary Headache Disorders). In considering

---

[2] A claimant's RFC "is the most [the claimant] can do" despite any "physical and mental limitations that affect what [the claimant] can do in a work setting" caused by an claimant's impairment(s) and related symptoms. 20 C.F.R. §§ 404.1545(a)(1) & 416.945(a)(1).

3

the claimant's headaches, SSR 19-4p directs the undersigned to consider [Listing] 11.02 (Epilepsy). However, the claimant's headaches have not resulted in generalized tonic-clonic seizures (occurring at least once a month for at least three consecutive months despite adherence to prescribed treatment) and no dyscognitive seizures (occurring at least once a week for at least three consecutive months despite adherence to prescribed treatment). In addition, the claimant has had no generalized tonic-clonic seizures (occurring at least once every two months for at least four consecutive months despite adherence to prescribed treatment) or dyscognitive seizures (occurring at least once every two weeks for at least three consecutive months despite adherence to prescribed treatment) or headache symptoms that would result in a marked limitation in either: physical functioning; understanding; remembering or applying information; interacting with others; concentrating, persisting, or maintaining pace; or adapting or managing oneself.

(Tr. at 19.)

At Step Four, in the assessing Plaintiff's RFC, the ALJ noted that Plaintiff had testified at the hearing that she could not work due in part to her migraine headaches that occurred "as often as three times a week, since she started Botox," that her migraine headaches "generally lasted for twenty-four hours," and that during a migraine she was "unable to do anything except lay in bed with a washcloth." (Tr. at 21.) The ALJ also noted that Plaintiff had testified that "she had just started infusions for her migraines, which has appeared to have provided proper relief, but i[s] not sure if it will last long-term." (*Id.*) The ALJ also recognized that Plaintiff had testified that "she could drive and did do some chores around the home" and "that she had a boyfriend and a family with whom she spent time." (*Id.*)

In evaluating Plaintiff's subjective statements, the ALJ found that her migraines (and other medically determinable impairments) "could reasonably be expected to cause the alleged symptoms" but that the objective medical evidence and other evidence in the record was not entirely consistent with Plaintiff's statements "concerning the intensity, persistence and limiting effects of these symptoms." (Tr. at 22.) The ALJ more specifically concluded that Plaintiff's allegations were "generally inconsistent with the record." (Tr. at 26.)

As to Plaintiff's migraines in particular, the ALJ noted that the medical records reflected that in October 2020, Plaintiff "complained of 20 plus headaches a month that lasted for over 12 hours causing issues in frontal, facial and occipital regions with her trying Botox," and that she was "diagnosed with chronic migraines without aura . . . ." (*Id.*) However, the ALJ noted that in 2021, she denied headaches at her annual well woman examination and at a visit to her primary care physician for chronic back pain. (*Id.*) The ALJ found that Plaintiff next sought treatment for

4

her migraines in December 2021, complaining of "daily headaches with throbbing, sharp pain with aura, nausea and photophobia" and "report[ed] 56 headaches in last three months," among other mental health issues.  (Tr. at 24.)  Finally, the ALJ noted that medical records from February 2023 reflect that Plaintiff's migraines were stable "during this time with her taking Ondanestron [Zofran] a[n]d Ajovy," and that medical records from a primary care visit for feet numbness and tingling reflect that Plaintiff denied headaches at the visit.  (Tr. at 25.)

In addition, and more generally, the ALJ noted (1) Plaintiff's noncompliance with some medications for other ailments and that she missed appointments with her eye doctor, and (2) Plaintiff's daily activities including that she told her mental health providers that "she was doing well on her mental health medications, swimming to help her back pain and as being active and in a great mood on weekends when her husband was around."  (Tr. at 26.)  Similarly, the ALJ noted that despite testifying that she had difficulty even watching television due to concentration issues, Plaintiff had also "told her own provider she spent her day watching television, movies and playing with her dog" and that she reported "she was helping to teach her foster child to read and write."  (*Id.*)

The ALJ assessed Plaintiff's RFC as "less than light exertion work," including specific postural and environmental limitations supported by treatment notes to account for Plaintiff's migraine headaches (along with various other severe and non-severe impairments).  (Tr. at 20, 26-27.)  At Step Five, the ALJ found that Plaintiff could perform jobs that exist in significant numbers in the national economy (marker, routing clerk, and collator operator) considering the assessed RFC and Plaintiff's other characteristics.  (Tr. at 27-28.)  The ALJ therefore denied Plaintiff's application for supplemental security income under the Social Security Act.

### III.  Plaintiff's Appeal

On appeal, Plaintiff argues that the ALJ erred at Step Three and failed to properly evaluate whether her migraines are medically equivalent to Listing 11.02 under SSR 19-4p.

Social Security Ruling 19-4p recognizes that primary headache disorders (including migraine headaches) are not a listed impairment but that a primary headache disorder may medically equal a listing.  2019 WL 4169635, at *7 (Aug. 26, 2019).[3]  Social Security Ruling 19-4p recognizes Listing 11.02 for Epilepsy as the "most closely analogous listed impairment," and

---

[3] Social Security Rulings or SSR's are binding on ALJ's.  *See* 20 C.F.R. § 404.160(b).

directs the ALJ to consider whether a claimant with a severe impairment of migraine headaches medically equals Listing 11.02, that is whether the claimant "exhibit[s] equivalent signs and limitations to those detailed in listing 11.02 (paragraph B or D for dyscognitive seizures) . . . ." *Id.* The administrative ruling then sets out how the ALJ will consider whether a severe impairment of migraine headaches "is equal in severity and duration to the criteria" in Listing 11.02B:[4]

> Paragraph B of listing 11.02 requires dyscognitive seizures occurring at least once a week for at least 3 consecutive months despite adherence to prescribed treatment. To evaluate whether a primary headache disorder is equal in severity and duration to the criteria in 11.02B, we consider: A detailed description from an [acceptable medical source] of a typical headache event, including all associated phenomena (for example, premonitory symptoms, aura, duration, intensity, and accompanying symptoms); the frequency of headache events; adherence to prescribed treatment; side effects of treatment (for example, many medications used for treating a primary headache disorder can produce drowsiness, confusion, or inattention); and limitations in functioning that may be associated with the primary headache disorder or effects of its treatment, such as interference with activity during the day (for example, the need for a darkened and quiet room, having to lie down without moving, a sleep disturbance that affects daytime activities, or other related needs and limitations).

*Id.*

### A.     The Commissioner's Arguments (Social Security Ruling 17-2p and the ALJ's Discretion at Step Three To Determine Medical Equivalence)

Before proceeding further, the Court addresses two arguments raised by the Commissioner. First, the Commissioner argues that SSR 17-2p is "determinative[]" and requires that Plaintiff's appeal be denied. (Doc. 9 at 10.) Second, the Commissioner argues that an ALJ has discretion to consider whether migraines are medically equivalent to Listing 11.02. Neither argument is persuasive under the controlling law.

Social Security Ruling 17-2p governs the ALJ's determination of medical equivalence at Step Three of the sequential analysis generally. 2017 WL 3928306 (Mar. 27, 2017). The administrative ruling recognizes three ways in which the ALJ "can find medical equivalence" at Step Three. *Id.* at *2-3. As relevant here, SSR 17-2p explains that at Step Three when considering a medically determinable impairment that is not a listed impairment, the ALJ

> will compare the findings with those [non-listed impairments] for closely analogous listed impairments. If the findings related to the impairment(s) are at least of equal

---

[4] Plaintiff focuses on Listing 11.02B in her appeal and does not address Listing 11.02D.

6

medical significance to those of a listed impairment, [the ALJ] will find that the impairment(s) is medically equivalent to the analogous listing.

*Id.* at *2. Furthermore, SSR 17-2p provides an "[e]videntiary requirement" to support a finding of disability based on medical equivalence at Step Three as follows:

To demonstrate the required support of a finding that an individual is disabled based on medical equivalence at step 3, the record must contain one of the following:

1. A prior administrative medical finding from an MC [federal or state agency medical consultant] or PC [federal or state agency psychological consultant] from the initial or reconsideration adjudication levels supporting the medical equivalence finding, or

2. [Medical expert] evidence, which may include testimony or written responses to interrogatories, obtained at the hearings level [before an ALJ] supporting the medical equivalence finding, or

3. A report from the [Appeals Council]'s medical support staff supporting the medical equivalence finding.

*Id.* at *3.

While SSR 17-2p requires some expert evidence in the record to support a finding of disability based on medical equivalence at Step Three, the administrative ruling also states that an ALJ is not required to obtain medical expert evidence prior to finding no medical equivalence if the ALJ "believes that the evidence [in the record] does not reasonably support a finding that the individual's impairment(s) medically equals a listed impairment." *Id.* at *4. Moreover, in doing so, SSR 17-2p does not require the ALJ to "articulate specific evidence supporting his or her finding" of no medical equivalence in this regard, but recognizes that the ALJ's "articulation of the reason(s) why the individual is or is not disabled at a later step . . . will provide rationale that is sufficient for a subsequent reviewer or court to determine the basis for the finding about medical equivalence at step 3." *Id.* Under the administrative ruling, the medical-equivalence determination at Step Three (as with the other required findings under the five-step sequential evaluation framework) "is an issue reserved to the Commissioner."[5] *Id.*

The Commissioner suggests in a single paragraph citing the text of SSR 17-2p without any supporting legal authority or meaningful legal analysis that Plaintiff's appeal necessarily fails (and the ALJ's decision must be affirmed) solely because the record does not include (1) "a prior administrative medical finding from a medical consultant or psychological consultant from the

---

[5] When the ALJ's decision becomes the decision of the Commissioner when the Appeals Council denies review, the ALJ will be the final decisionmaker.

initial or reconsideration adjudication levels supporting the medical equivalence finding," (2) "evidence from a medical expert obtained at the hearings level supporting the medical equivalence finding," or (3) "a report from the Appeals Council's medical support staff supporting the medical equivalence finding." (Doc. 9 at 10.) The Court is not persuaded, at this juncture, by this conclusory argument.

At base, "[s]ocial security proceedings are inquisitorial rather than adversarial." *Sims v. Apfel*, 530 U.S. 103, 110-11 (2000). The logic of the Commissioner's argument, if true, is somewhat inconsistent with a reading of SSR 17-2p as a whole. Although SSR 17-2p requires certain medical evidence to support an ALJ's finding of medical equivalence at Step Three, the ruling also recognizes that (1) the ALJ may rely on the existing record and is not required to obtain medical expert evidence before finding that a medically determinable impairment is not medically equivalent to a listed impairment, and (2) the ALJ may rely on the rationale at the subsequent RFC stage of the analysis in finding that the existing record (which will only consist of the prior administrative medical findings) does not reasonably support a finding of medical equivalence. Thus, regardless of the findings by the state agency consultants—and regardless whether the state agency consultants considered medical equivalency to any particular Listing—an ALJ may conclude that the record does not support a finding of medical equivalence at Step Three. The Court is not persuaded at this juncture, based on the Commissioner's conclusory argument, that the "evidentiary requirement" under SSR 17-2p is determinative. It appears instead that the more proper framework of judicial review is whether the ALJ's decision finding no medical equivalency is supported by substantial evidence in the record the same as the review of the ALJ's decisions at each of the other four steps in the sequential evaluation. Nonetheless, the Court need not further consider the Commissioner's somewhat under-developed argument here because the Court finds in this case that the ALJ's decision is supported by substantial evidence in a more traditional sense beyond relying exclusively on the "evidentiary requirement" under SSR 17-2p.

Second, the Commissioner suggests that "SSR 19-4p does not require an ALJ to evaluate all severe headache disorders in light of [Listing] 11.02." (Doc. 9 at 11.) Here, the Commissioner offers an unsupported and legally dubious assertion that the Social Security Administration has "discretion in the context of medical-equivalence analysis" as to a medically determinable impairment of a primary headache disorder (including migraines). (*Id.* at 10.) Unlike the

8

Commissioner's argument under SSR 17-2p's "evidentiary requirement" provision, the Court soundly rejects this argument.

Social Security Administration regulations require that the ALJ *must* consider medical equivalency of the impairments to a listed impairment as to medically determinable impairments that are not contained in the Listing. 20 C.F.R. § 404.1526(b)(2) ("If you have an impairment(s) that is not described in appendix 1 [i.e., is not a listed impairment], we *will* compare your findings with those for closely analogous listed impairments. If the findings related to your impairment(s) are at least of equal medical significance to those of a listed impairment, we will find that your impairment(s) is medically equivalent to the analogous listing") (emphasis added); 20 C.F.R. § 416.926(b)(2) (same); *see* SSR 17-2P, 2017 WL 3928306, at *2 ("If an individual has an impairment(s) that is not described in the listings, we *will* compare the findings with those for closely analogous listed impairments.") (emphasis added). Social Security Ruling 19-4p unequivocally identifies Listing 11.02B and D as "the most closely analogous listed impairment for [a medically determinable impairment] of a primary headache disorder," including migraines. 2019 WL 4169635, at *7. The Commissioner does not suggest that SSR 19-4p has been rescinded or that another more closely analogous listed impairment has been identified by the Social Security Administration (or any other source of authority).

Instead, the Commissioner only cites the following portion of SSR 19-4p:

8. How do we evaluate [a medically determinable impairment] of a primary headache disorder under the Listing of Impairments?

Primary headache disorder is not a listed impairment in the Listing of Impairments (listings); however, we *may* find that a primary headache disorder, alone or in combination with another impairment(s), medically equals a listing.

Epilepsy (listing 11.02) is the most closely analogous listed impairment for [a medically determinable impairment] of a primary headache disorder. While uncommon, a person with a primary headache disorder *may* exhibit equivalent signs and limitations to those detailed in listing 11.02 (paragraph B or D for dyscognitive seizures), and we *may* find that his or her [medically determinable impairment(s)] medically equals the listing.

(Doc. 9 at 10-11 (quoting SSR 19-4p, 2019 WL 4169635, at *7) (emphasis added by the Commissioner).) The word "may" emphasized by the Commissioner in the quoted portion of SSR 19-4p above clearly refers to a finding of medical equivalence in a claimant's favor by an ALJ. Nothing in SSR 19-4p suggests that the ALJ has discretion to consider in the first instance whether a medically determinable impairment of a primary headache disorder (including migraines) is

9

medically equivalent to Listing 11.02B and D, which SSR 19-4p identifies as "the most closely analogous impairment" (emphasis added). The Commissioner's argument in this regard is misplaced and is, on its face, contrary to Social Security Administration regulations and SSR 19-4p, which is binding on the ALJ.[6]

### B. Whether Substantial Evidence Supports the ALJ's Finding at Step Three

Plaintiff argues that the ALJ's analysis at Step Three is deficient on its face and requires remand. Consistent with SSR 17-2p, however, the Eighth Circuit has held that, "[g]enerally, an ALJ's failure to adequately explain [her] factual findings is not a sufficient reason for setting aside an administrative finding." *Vance v. Berryhill*, 860 F.3d 1114, 1118 (8th Cir. 2017) (internal quotation marks omitted). Instead, as the Eighth Circuit held in *Vance*, "[a]n ALJ's failure to address a specific listing or to elaborate on [her] conclusion that a claimant's impairments do not meet the listings is not reversible error if the record supports the conclusion." *Id.* On the other hand, "[r]emand is warranted where the ALJ's factual findings, considered in light of the record as a whole, are insufficient to permit [the] Court to conclude that substantial evidence supports the Commissioner's decision." *Id.*; *see Hesseltine v. Colvin*, 800 F.3d 461, 466 (8th Cir. 2015). The Court agrees with the Commissioner that the controlling legal question here is whether the ALJ's finding that Plaintiff's migraines are not medically equivalent to Listing 11.02B is supported by substantial evidence. *See also* SSR 17-2p, 2017 WL 3928306, at *4. Considering the record and the ALJ's decision and findings as a whole, the Court is persuaded that the ALJ's decision at Step Three is reasonably supported by substantial evidence.

Consistent with the ALJ's findings above, the medical record shows that Plaintiff sought treatment for headaches in April 2020, among a myriad of other health issues. (Tr. at 721.) She was diagnosed with chronic migraine without aura and had been treated with Botox. (Tr. at 569.) In July 2020, she was referred to see a neurology specialist. (Tr. at 574.) Accordingly, in October

---

[6] The Commissioner's argument appears to arise from a somewhat unreasonable misinterpretation of Plaintiff's argument. The Commissioner refers to Plaintiff as "inaccurately claiming . . . that an ALJ's failure to evaluate the migraine impairment meant [the ALJ's] decision was unsupported by substantial evidence." (Doc. 9 at 10.) Even a cursory review of Plaintiff's brief, however, makes clear that Plaintiff's argument here is that the "ALJ failed to *properly* evaluate whether Detherow's migraines medically equaled listing 11.02, resulting in a decision that is not supported by substantial evidence." (Doc. 8 at 18 (emphasis added).) Indeed, the Commissioner's argument makes even less sense given that the ALJ *did* expressly consider whether Plaintiff's migraines are medically equivalent to Listing 11.02. The Commissioner provides no support for the unnecessary proposition that the ALJ may evaluate Plaintiff's migraines at Step Three by looking at another listed impairment (which appears to be unsupported as a matter of law anyway).

10

2020, Plaintiff saw Dr. Steven Ellis Jr., a neurologist.  Dr. Ellis's treatment notes include that Plaintiff reported a history of migraines for the last 5-6 years, that she "currently has headache, typical, frontal can radiate holocephalically" and that her headaches were "dull and throbbing, up to 10/10 intensity" and were associated with photophobia, vertigo, and nausea.  (Tr. at 590-91.) Plaintiff reported that she "does not remember [the] last time she did not have [a] headache" and that she takes up to 3000mg of Tylenol daily for her headaches.  (Tr. at 591.)  Dr. Ellis noted that Plaintiff previously received Botox injections for 5-6 years but it was "not helping" and that Topamax "caused severe illness" and was "contraindicated" because of her glaucoma.  (*Id.*)  Dr. Ellis diagnosed Plaintiff with chronic migraine without aura (not intractable and without status migrainosus) and noted that her more than 15 migraines per month for more than 3 months was "consistent with chronic migraines."  (Tr. at 592.)  Dr. Ellis prescribed Effexor to be increased in dosage after one week and up to 225 mg daily as needed, as well as a monthly Aimovig injection. (*Id.*)  Dr. Ellis indicated a follow-up appointment should occur in three months.  (*Id.*)

Plaintiff again saw Dr. Ellis in December 2021, more than a year later.  She reported "chronic migraines" and "[d]aily headaches."  (Tr. at 1135.)  Plaintiff indicated that the Aimovig injection helped but that it wore off after 1-2 weeks and that she "[c]ontinues to have daily headaches."  (*Id.*)  Plaintiff reported having more than 15 headaches per month for more than three months and that her headaches effected the frontal/posterior region, and were a 9 out of 10 on a pain scale and presented as "throbbing" and "sharp" with both aura and "photophobia/nausea." (*Id.*)  The treatment notes indicate that Plaintiff takes Tylenol daily and that she cannot take NSAIDS due to her gastric bypass; that Topamax "caused taste changes" and that she "failed" Propranolol and Effexor in the past.  (Tr. at 1135, 1136.)  Dr. Ellis performed trigger point nerve block injections, prescribed Prozac (to be increased from 20mg to 40 mg after one week and then up to 80 mg as needed), and changed Aimovig to Emgality.  (Tr. at 1136.)  Dr. Ellis instructed Plaintiff to return in three months for another round of trigger point nerve block injections.  (*Id.*) It does not appear that Plaintiff returned to the clinic.

At the hearing before the ALJ on July 18, 2023, Plaintiff testified that she had previously had Botox injections to treat her migraines but that she was then on "IV infusions" that helped and that while she still gets migraine headaches, "they are just not long and intensified as before . . . ." (Tr. at 60.)  Plaintiff testified that she still gets migraines "two or three times a week" with varying levels of severity even with the injections.  (Tr. at 60, 65.)  She testified that the severity varies

11

both with hours they last and with the "strengths" of her migraines. (Tr. at 65.) Plaintiff testified that her onset medication was not working. (Tr. at 66.) She testified that to recover from a migraine she has to "stay inside, like dark, quiet" and will lay with her head covered after taking her onset medication. (Tr. at 66.)

The ALJ found Plaintiff's testimony and subjective statements were "generally inconsistent with the record." (Tr. at 26.) The ALJ noted that throughout 2021 until her December 2021 follow-up appointment with Dr. Ellis (14 months after the initial referral appointment), Plaintiff repeatedly denied headaches while seeking medical treatment for other issues from other medical professionals. (Tr. at 22-23; *see* Tr. at 579, 709, 738, 781, 1145, 1192, 1282, 1287, 1292, 1300.) The only medical records that reference Plaintiff's migraines throughout 2021 are the records of her eye doctors (*see, e.g.*, Tr. at 608, 1227), and a May 2021 psychiatric evaluation that recorded Plaintiff as receiving a monthly Aimivog injection for "severe migraines," (Tr. at 799). After December 2021, Plaintiff reported having migraines at multiple glaucoma-related eye doctor appointments between January 2022 and October 2022, (Tr. at 1241, 1316, 1322, 1486, 1502), and at an April 2022 medication management appointment, she reported having been "started on Ajovy/migraine injection," (Tr. at 1510). In January 2023, Plaintiff reported that her "migraines with nausea are managed with ondansetron [Zofran] and fremanezumab [Ajovy]" and are "stable." (Tr. at 1442, 1446.)

The ALJ's finding that Plaintiff's testimony and subjective statements were not consistent with the medical records is supported by reasonable evidence. The medical records reasonably do not support the required frequency or severity to satisfy SSR 19-4p to find medical equivalency to Listing 11.02B. Plaintiff's complaints of headaches throughout the medical records are relatively limited and discrete, suggesting they did not occur at least once a week for three consecutive months despite adherence to treatment or that they were not occurring with the required frequency *because of* Plaintiff's treatment. Plaintiff testified that the injections had helped, as was reflected in the medical records. (*See* Tr. at 59-60, 1442.) Moreover, the medical records do not indicate any limitations in Plaintiff's functioning due to her migraine headaches. And although Dr. Ellis noted several potential side effects for Prozac, Compazine, and Benadryl, for example, Plaintiff does not point to anything in the record or her testimony that she experienced side effects from these medications to a significant level akin to a dyscognitive seizure. "An ALJ's decision is not outside the zone of choice simply because this Court might have reached a different conclusion

12

had [it] been the initial finder of fact." *Kraus v. Saul*, 988 F.3d 1019, 1024 (8th Cir. 2021) (internal quotation marks omitted). The ALJ's decision here falls within the "available zone of choice" and is reasonably supported by the record as a whole. *Id.* (internal quotation marks omitted).

## Conclusion

Therefore, after careful consideration and review, and for the reasons explained above, the Court **ORDERS** that the ALJ's decision is **AFFIRMED**.

**IT IS SO ORDERED**.

s/ Roseann A. Ketchmark
ROSEANN A. KETCHMARK, JUDGE
UNITED STATES DISTRICT COURT

DATED: March 17, 2026